## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENISH BHAVSAR, derivatively on behalf of LULULEMON ATHLETICA INC., | Case No.: 1:24-cv-08405 |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| CALVIN MCDONALD, MEGHAN FRANK, MICHAEL CASEY, SHANE GRANT, KATHRYN HENRY, TERI LIST, ALISON LOEHNIS, ISABEL MAHE, JON MCNEILL, MARTHA MORFITT, DAVID MUSSAFER, and EMILY WHITE, | |
| Defendants, | |
| and | |
| LULULEMON ATHLETICA INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Denish Bhavsar ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Lululemon Athletica Inc. ("Lululemon" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Calvin McDonald ("McDonald"), Meghan Frank ("Frank"), Michael Casey ("Casey"), Shane Grant ("Grant"), Kathryn Henry ("Henry"), Teri List ("List"), Alison Loehnis ("Loehnis"), Isabel Mahe ("Mahe"), Jon McNeill ("McNeill"), Martha Morfitt ("Morfitt"), David Mussafer ("Mussafer"), and Emily

White ("White") (collectively, the "Individual Defendants," and together with Lululemon, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Lululemon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants McDonald and Frank for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lululemon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from December 7, 2023 through July 24, 2024, both dates inclusive (the "Relevant Period").

2.      Lululemon is a designer athletic wear brand that designs, distributes, and retails technical athletic apparel, footwear, and accessories. The Company splits its sales and revenue into three divisions: Americas, China Mainland, and Rest of World. The majority of the Company's revenue comes from the Americas, which made up 79% of net revenue in the fiscal year ended

January 28, 2024 (the "2023 Fiscal Year")[1], 94% of net revenue in 2022, and 85% of net revenue in 2021.

3.    The Relevant Period began on December 7, 2023 when the Company announced its financial results for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Earnings Release"). The 3Q 2023 Earnings Release revealed a "***strong financial quarter for lululemon as [the Company's] innovative product offerings*** and community activations continued to ***powerfully resonate with [its] guests globally***."[2]

4.    That same day, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Form 10-Q"). The 3Q 2023 Form 10-Q highlighted the Company's inventory allocation, stating:

> ***The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed***. Our inventory balance as of October 29, 2023 was $1.7 billion, a decrease of 4% from October 30, 2022.

5.    However, unbeknownst to the general public during the Relevant Period, these statements regarding the effectiveness of the Company's inventory allocation methods proved to be false, as the reality was that Lululemon was facing obstacles with its inventory allocation and color palette execution, especially with respect to the product launch of the Company's Breezethrough leggings. Due to the foregoing, the Company's sales in the Americas slowed drastically. Despite this, during the Relevant Period, Defendants concealed this reality, instead highlighting the effectiveness of the Company's methods and procedures.

---

[1] The Company's fiscal year ends on the Sunday closes to January 31 of the following year. For the fiscal year ended February 2, 2025 (the "2024 Fiscal Year"). For the fiscal year ended January 29, 2023 (the "2022 Fiscal Year"). For the fiscal year ended January 30, 2022 (the "2021 Fiscal Year").
[2] Unless otherwise noted, all emphasis is added.

6.      The truth began to emerge on March 21, 2024 when the Company issued a press release announcing its financial and operational results for the fourth quarter and full 2023 Fiscal Year (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release revealed to investors that the Company's growth in the Americas was stalling, with net revenue growing by only 9% in the fourth quarter, and 12% for the entire year, compared to 12% growth in the third quarter of 2023, and 29% growth in the same period the year prior.

7.      On this news, the price of the Company's common stock fell $75.65 per share, or approximately 15.8%, from a closing price of $478.84 per share on March 21, 2024 to a closing price of $403.19 per share on March 22, 2024. However, the Individual Defendants continued to obfuscate the truth about the Company's inefficient inventory allocation procedures.

8.      The truth did not fully emerge until July 24, 2024, when Bloomberg issued a report revealing that several analysts had found the Company's inventory allocation to be inconsistent (the "July 2024 Bloomberg Report"). The July 2024 Bloomberg Report indicated that the Company's launch of its Breezethrough leggings earlier in July was mired by inconsistent inventory allocation, both in-store and online.

9.      On this news, the price of the Company's common stock fell $9.31 per share, or approximately 3.3%, from a closing price of $281.37 per share on July 23, 2024 to a closing price of $272.06 per share on July 24, 2024.

10.      Then, before the market opened on July 25, 2024, Bloomberg reported that a spokesperson for the Company had revealed that the Company "made the decision to pause on sales [of the Breezethrough yoga wear] for now to make any adjustments necessary to deliver the best possible product experience."

11.      On this news, the price of the Company's common stock fell an additional $24.74

per share, or approximately 9.1%, from a closing price of $272.06 per share on July 24, 2024 to a closing price of $247.32 per share on July 25, 2024.

12.    During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was experiencing issues with its inventory allocation and color palette execution; (2) as such, the Company's launch of the Breezethrough leggings underperformed; (3) as a result of this, the Company's sales in the Americas began to stall; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

13.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, two of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of approximately $13.2 million.

14.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Lululemon to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between November 27, 2023 and July 28, 2024, approximately 2,702,519 shares of Lululemon common stock were repurchased, costing the

Company **over $914.3 million**. As the Company's stock was actually worth only $247.32 per share, the price at which it was trading when markets closed on July 25, 2024, the Company overpaid for repurchases of its own stock **by over $245.9 million** in total.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, losses due to the repurchases discussed herein, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

6

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

24.      Plaintiff is a current shareholder of Lululemon. Plaintiff has continuously owned Company common stock since first purchasing the stock in March 2023.

### Nominal Defendant Lululemon

7

25.     Lululemon is a Delaware corporation with its principal executive offices at 1818 Cornwall Avenue, Vancouver, British Columbia V6J 1C7. Lululemon's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "LULU."

**Defendant McDonald**

26.     Defendant McDonald has served as the Company's CEO and as a Company director since August 2018. According to the proxy statement that the Company filed with the SEC on April 25, 2024 (the "2024 Proxy Statement"), as of April 4, 2024, Defendant McDonald beneficially owned 291,362 shares of the Company's common stock.[3] Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant McDonald owned approximately $104.2 million worth of Lululemon stock as of that date.[4]

27.     For the 2023 Fiscal Year, Defendant McDonald received $16,494,777 in total compensation from the Company. This included $1,292,308 in salary, $5,000,011 in stock awards, $4,999,937 in option awards, $5,169,231 in non-equity incentive plan compensation, and $33,290 in all other compensation.

28.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant McDonald made the following sale of Company common stock:

---

[3] In the section titled "Principal Shareholders and Stock Ownership by Management," the 2024 Proxy Statement represents that the total "Number of Shares Beneficially Owned" for each individual discussed therein is made up of their Common Stock and their Rights to Acquire.

[4] Plaintiff's calculations of the worth of each Individual Defendant's Lululemon stock holdings discussed herein are based on the sum of that Individual Defendant's holdings of Common Stock and Rights to Acquire (*i.e.*, the amount in the "Number of Shares Beneficially Owned" column under "Principal Shareholders and Stock Ownership by Management" in the 2024 Proxy Statement), multiplied by $357.56 (*i.e.*, the price per share of Lululemon's common stock at the close of trading on April 4, 2024).

| Date | Number of Shares Sold | Average Price/Share | Proceeds |
|---|---|---|---|
| 12/18/2023 | 25,000 | $497.50 | $12,437,500 |

Thus, in total, before the fraud was exposed, he sold 25,000 shares of Company common stock on inside information, for which he received approximately $12.4 million in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

29.    The 2024 Proxy Statement stated the following about Defendant McDonald:

Calvin McDonald was appointed chief executive officer of lululemon and a member of our board of directors in August 2018. Prior to joining lululemon, Mr. McDonald served for five years as president and chief executive officer of Sephora Americas, a division of the LVMH group of luxury brands. Prior to joining Sephora in 2013, Mr. McDonald spent two years as president and chief executive officer of Sears Canada. Prior to his tenure at Sears Canada, Mr. McDonald spent 17 years at Loblaw Companies Limited, a grocery and pharmacy leader in Canada. Mr. McDonald is on the board of directors of The Walt Disney Company. Mr. McDonald received an MBA from the University of Toronto, and a Bachelor of Science degree from the University of Western Ontario.

**Defendant Frank**

30.    Defendant Frank has served as the Company's CFO since November 2020. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Frank beneficially owned 20,740 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant Frank owned approximately $7.4 million worth of Lululemon stock as of that date.

31.    For the 2023 Fiscal Year, Defendant Frank received $4,091,722 in total compensation from the Company. This included $738,462 in salary, $1,400,132 in stock awards, $600,018 in option awards, $1,329,231 in non-equity incentive plan compensation, and $23,879

in all other compensation.

32.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Frank made the following sale of Company common stock:

| Date | Number of Shares Sold | Average Price/Share | Proceeds |
|---|---|---|---|
| 12/18/2023 | 1,553 | $500.00 | $776,500 |

Thus, in total, before the fraud was exposed, she sold 1,553 shares of Company common stock on inside information, for which she received approximately $776,500 in proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

33.     The 2024 Proxy Statement stated the following about Defendant Frank:

Meghan Frank has served as our chief financial officer since November 2020. She joined lululemon in 2016 as the senior vice president, financial planning and analysis, and served as interim co-chief financial officer from April 2020 until her appointment to chief financial officer. Ms. Frank is now responsible for leading finance, tax, treasury, investor relations, asset protection, facilities, transformation, and strategy functions of the business. Prior to joining lululemon, Ms. Frank held senior finance and merchandise planning roles at Ross Stores and J. Crew, where she served for nearly a decade. She earned her Bachelor of Arts degree from Colgate University.

**Defendant Casey**

34.     Defendant Casey has served as a Company director since October 2007. He previously served as the Chair of the Board from May 2014 through September 2014, and as Co-Chair of the Board from September 2014 through April 2017. He currently also serves as the Chair of the Audit Committee and as a member of the People, Culture & Compensation Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Casey beneficially owned 58,388 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on April 4, 2024 was $357.56, Defendant Casey owned

approximately $20.9 million worth of Lululemon stock as of that date.

35.    For the 2023 Fiscal Year, Defendant Casey received $297,924 in total

compensation from the Company. This included $149,167 in fees earned or paid in cash and

$148,757 in stock awards.

36.    The 2024 Proxy Statement stated the following about Defendant Casey:

Michael Casey has been a member of our board of directors since October 2007.
Mr. Casey also served as co-chair of the board of directors from September 2014
to April 2017, and as chair of the board of directors from May 2014 to September
2014.

He retired from Starbucks Corporation in October 2007, where he had served as
senior vice president and chief financial officer from August 1995 to September
1997, and executive vice president, chief financial officer and chief administrative
officer from September 1997 to October 2007. Subsequent to retirement he served
as a senior advisor to Starbucks Corporation from October 2007 to May 2008, and
from November 2008 to January 2015. Prior to joining Starbucks, Mr. Casey was
executive vice president and chief financial officer for Family Restaurants, Inc. and
president and chief executive officer of El Torito Restaurants, Inc. He was also a
member of the board of directors of the Nasdaq OMX Group, Inc. from January
2001 to May 2012. Mr. Casey graduated from Harvard College with a B.A. degree
in Economics, cum laude, and Harvard Business School with an MBA degree.

*Skills & Experience*

Our board of directors selected Mr. Casey to serve as director because he has
extensive experience in corporate finance and accounting, managing retail-focused
industry operations, strategic planning, and public company corporate governance.

**Defendant Grant**

37.    Defendant Grant has served as a Company director since November 2023. He also

serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April

4, 2024, Defendant Grant beneficially owned 248 shares of the Company's common stock. Given

that the price per share of the Company's common stock at the close of trading on April 4, 2024

was $357.56, Defendant Grant owned approximately $88,675 worth of Lululemon stock as of that

date.

38.     For the 2023 Fiscal Year, Defendant Grant received $49,647 in total compensation from the Company. This included $9,066 in fees earned and paid in cash and $40,581 in stock awards.

39.     The 2024 Proxy Statement stated the following about Defendant Grant:

Shane Grant has been a member of our board of directors since November 2023.

He currently serves as Group Deputy CEO, CEO Americas and EVP Dairy, Plant-Based and Global Sales at Danone. In his role, Mr. Grant is responsible for leading the Danone business across North America and Latin America, as well as Danone's largest global category in Dairy and Plant-Based and global Customer and Commercial Leadership. Mr. Grant joined Danone in May 2020 as EVP and CEO of Danone North America. Previously, Mr. Grant spent nearly 20 years with The Coca-Cola Company, where he held global and operating leadership roles in category, commercial, and general management. Before joining The Coca-Cola Company, he held customer, supply chain, and brand management positions at Unilever. Mr. Grant serves on the board of directors of the US Food Industry Association (FMI), the executive committee of the Consumer Brands Association, and is a member of the American Heart Association CEO roundtable. He is also a Member of World 50. Mr. Grant holds Business and Arts degrees from the University of Auckland.

*Skills & Experience*

Our board of directors selected Mr. Grant to serve as a director because of his experience with consumer brands and in international markets.

**Defendant Henry**

40.     Defendant Henry has served as a Company director since January 2016. She also serves as a member of the Audit Committee and the People, Culture & Compensation Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Henry beneficially owned 4,379 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant Henry owned approximately $1.6 million worth of Lululemon stock as of that date.

41.    For the 2023 Fiscal Year, Defendant Henry received $269,590 in total compensation from the Company. This included $120,833 in fees earned and paid in cash and $148,757 in stock awards.

42.    The 2024 Proxy Statement stated the following about Defendant Henry:

Kathryn Henry has been a member of our board of directors since January 2016.

Ms. Henry is co-founder and advisor of LightBrite, where she also served as CEO from January 2022 to February 2023. From 2015 to 2022, she served as a strategic consultant for retail and technology companies, in addition to venture capital, investment and consulting firms seeking executive level guidance. Ms. Henry previously served as chief information officer, logistics & distribution at lululemon from 2010 to 2014 where she oversaw all global information and technology operations for the company. Prior to joining lululemon in 2010, Ms. Henry worked at Gap, Inc., where she served as vice president and chief information officer of international IT and Gap North America and was responsible for the systems support of key international growth initiatives. Previously, she was vice president of Dockers Business Divestiture and vice president of global IT strategy & development at Levi Strauss & Co. Ms. Henry was selected as a Global CIO Top 25 Breakaway Leader in 2013, and was a member of the National Retail Federation CIO council during her tenure with lululemon.

*Skills & Experience*

Our board of directors believes Ms. Henry's strategic technology and retail experience as well as her experience with lululemon provides valuable insight to our board of directors.

**Defendant List**

43.    Defendant List has served as a Company director since March 2024. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant List beneficially owned 96 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant List owned approximately $34,326 worth of Lululemon stock as of that date.

44.    The 2024 Proxy Statement stated the following about Defendant List:

Teri List has been a member of our board of director since March 2024.

Ms. List served as executive vice president and chief financial officer of Gap Inc, from January 2017 until her retirement in June 2020. Prior to joining the Gap, she served as chief financial officer at DICK's Sporting Goods and Kraft Food Group, overseeing organizations across finance, accounting, real estate, legal, and information technology. Prior to those roles, Ms. List spent nearly 20 years with Procter & Gamble culminating in the role of SVP and Treasurer. She began her career in public accounting at Deloitte LLP. She currently serves on the board of directors of Danaher Corporation, Microsoft Corporation and Visa Inc. Ms. List has a bachelor's degree in accounting and an honorary doctorate from Northern Michigan University and is a certified public accountant.

*Skills & Experience*

Our board of directors selected Ms. List to serve as a director because of her extensive experience in corporate finance and accounting and her experience as a business leader and board member for global companies in the retail and consumer products industry.

### **Defendant Loehnis**

45.     Defendant Loehnis has served as a Company director since January 2022. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Loehnis beneficially owned 1,065 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant Loehnis owned approximately $380,801 worth of Lululemon stock as of that date.

46.     For the 2023 Fiscal Year, Defendant Loehnis received $257,090 in total compensation from the Company. This included $108,333 in fees earned and paid in cash and $148,757 in stock awards.

47.     The 2024 Proxy Statement stated the following about Defendant Loehnis:

Alison Loehnis has been a member of our board of directors since January 2022.

Since October 2022, Ms. Loehnis has been ad-interim CEO and president of Luxury and Fashion at Yoox Net-a-Porter where she is responsible for Net-a-Porter, Mr. Porter and the Outnet businesses, and where she was president of the luxury

division from 2015 until 2021. She has held several leadership roles with expanding responsibility since she joined the company in 2007 and has been instrumental in the conception and launch of major initiatives including TheOutnet.com and MrPorter.com. Previously, Ms. Loehnis held positions with LVMH, Hachette Filipacchi and The Walt Disney Company, after starting her career with Saatchi & Saatchi. Ms. Loehnis received a degree in Art History from Brown University.

*Skills & Experience*

Our board of directors selected Ms. Loehnis to serve as a director because it believes her experience as a leader in the retail industry, and international markets will provide valuable insight to the company.

**Defendant Mahe**

48.     Defendant Mahe has served as a Company director since November 2022. She also serves as a member of the Corporate Responsibility, Sustainability & Governance Committee and the People, Culture & Compensation Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Mahe beneficially owned 718 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant Mahe owned approximately $256,728 worth of Lululemon stock as of that date.

49.     For the 2023 Fiscal Year, Defendant Mahe received $272,773 in total compensation from the Company. This included $115,833 in fees earned and paid in cash and $156,940 in stock awards.

50.     The 2024 Proxy Statement stated the following about Defendant Mahe:

Isabel Mahe has been a member of our board of directors since November 2022.

Ms. Mahe currently serves as Vice President and Managing Director of Greater China at Apple Inc. She joined Apple in 2008 as Vice President of Wireless Technologies and oversaw the development of cellular, Wi-Fi, Bluetooth, NFC, location and motion technologies for products across the business. Prior to Apple, she served as Vice President of Wireless Software Engineering at Palm and held key managerial positions at other technology-focused organizations. Ms. Mahe served on the board of directors of Starbucks from 2019 to 2023 and was named to

Fortune's 50 Most Powerful Women list in 2021 and 2022. She received a Bachelor of Applied Science and a Masters of Engineering from Simon Fraser University in British Columbia, Canada and an MBA from the University of California, Berkeley.

*Skills & Experience*

Our board of directors selected Ms. Mahe to serve as a director because she has a strong track record of driving growth in fast growing and global markets, and industries through her knowledge of consumer and product trends.

**Defendant McNeill**

51.     Defendant McNeill has served as a Company director since April 2016. He also serves as a member of the Corporate Responsibility, Sustainability & Governance Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant McNeill beneficially owned 7,830 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant McNeill owned approximately $2.8 million worth of Lululemon stock as of that date.

52.     For the 2023 Fiscal Year, Defendant McNeill received $254,590 in total compensation from the Company. This included $105,833 in fees earned or paid in cash and $148,757 in stock awards.

53.     The 2024 Proxy Statement stated the following about Defendant McNeill:

Jon McNeill has been a member of our board of directors since April 2016.

Since January 2020, Mr. McNeill has served as chief executive officer of DVx Ventures. He served as chief operating officer of Lyft, Inc. from March 2018 to July 2019. From September 2015 to February 2018, he served as president of Tesla Motors Inc., overseeing customer-facing operations. Prior to joining Tesla, he was the chief executive officer of Enservio, Inc., a software company, from 2006 until 2015, and founder of multiple technology and retail companies, including TruMotion, Sterling, First Notice Systems and Trek Bicycles Stores, Inc. He serves on the board of directors of General Motors. Mr. McNeill began his career at Bain & Company. He is a graduate of Northwestern University.

*Skills & Experience*

Our board of directors selected Mr. McNeill because it believes his executive experience and innovative and entrepreneurial attributes provide valuable insight and are aligned with our unique culture.

**Defendant Morfitt**

54.     Defendant Morfitt has served as a Company director since December 2008 and as the Chair of the Board since March 2022. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Morfitt beneficially owned 90,895 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant Morfitt owned approximately $32.5 million worth of Lululemon stock as of that date.

55.     For the 2023 Fiscal Year, Defendant Morfitt received $417,090 in total compensation from the Company. This included $268,333 in fees earned and paid in cash and $148,757 in stock awards.

56.     The 2024 Proxy Statement stated the following about Defendant Morfitt:

Marti Morfitt has been a member of our board of directors since December 2008, and has been the chair of the board since March 2022.

She has served as a principal of River Rock Partners, Inc., a business and cultural transformation consulting firm, since 2008. Ms. Morfitt served as the chief executive officer of Airborne, Inc. from October 2009 to March 2012. She served as the president and chief executive officer of CNS, Inc., a manufacturer and marketer of consumer healthcare products, from 2001 through March 2007. From 1998 to 2001, she was chief operating officer of CNS, Inc. Ms. Morfitt currently serves on the board of directors of Graco, Inc. and Olaplex Holdings, Inc. She served on the board of directors of Mercer International Inc., a forest products company, from 2017 to 2020, and Life Time Fitness, Inc. from 2008 to 2015. She received her HBA from the Richard Ivey School of Business at the University of Western Ontario, and an MBA from the Schulich School of Business at York University.

*Skills & Experience*

Our board of directors selected Ms. Morfitt to serve as director because she has extensive public board experience and years of leading and managing branded consumer businesses, and their operations and strategic planning.

**Defendant Mussafer**

57.    Defendant Mussafer has served as a Company director since September 2014. He also previously served as a director from 2005 until 2010. In addition, Defendant Mussafer serves as the Lead Director and as the Chair for the Corporate Responsibility, Sustainability & Governance Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Mussafer beneficially owned 20,677 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant Mussafer owned approximately $7.4 million worth of Lululemon stock as of that date.

58.    For the 2023 Fiscal Year, Defendant Mussafer received $320,424 in total compensation from the Company. This included $171,667 in fees earned and paid in cash and $148,757 in stock awards.

59.    The 2024 Proxy Statement stated the following about Defendant Mussafer:

David Mussafer is the lead director and has been a member of our board of directors since September 2014.

Mr. Mussafer also served as a director of lululemon from 2005 until 2010. Mr. Mussafer is chairman and managing partner of Advent International, L.P. which he joined in 1990. Prior to Advent, Mr. Mussafer worked at Chemical Bank and Adler & Shaykin in New York. Mr. Mussafer has led or co-led more than 30 buyout investments at Advent across a range of industries. Mr. Mussafer currently serves on the board of directors of Olaplex Holdings Inc. Mr. Mussafer previously served as a director of a number of public and private companies over the course of his career at Advent, including First Watch Restaurants, Inc. from 2019 to 2021. Mr. Mussafer holds a BSM, cum laude, from Tulane University and an MBA from the Wharton School of the University of Pennsylvania.

*Skills & Experience*

Our board of directors believes Mr. Mussafer's extensive experience enables him to provide valuable insights to the board of directors regarding board processes, and

18

operations as well as the relationship between the board of directors and shareholders.

**Defendant White**

60.    Defendant White has served as a Company director since November 2011. She also serves as the Chair of the People, Culture & Compensation Committee and as a member of Corporate Responsibility, Sustainability & Governance Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant White beneficially owned 18,097 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $357.56, Defendant White owned approximately $6.5 million worth of Lululemon stock as of that date.

61.    For the 2023 Fiscal Year, Defendant White received $290,840 in total compensation from the Company. This included $142,083 in fees earned and paid in cash and $148,757 in stock awards.

62.    The 2024 Proxy Statement stated the following about Defendant White:

Emily White has been a member of our board of directors since November 2011.

She has served as President of Anthos Capital, a Los Angeles-based investment firm since 2018. Prior to Anthos, Ms. White was chief operating officer at Snap, Inc. from January 2014 to March of 2015. Prior to joining Snap, Ms. White held several leadership roles at Facebook Inc. from 2010 to 2013 including as Director of Local Business Operations, Director of Mobile Business Operations and Head of Business Operations at Instagram. From 2001 to 2010, Ms. White worked at Google where she ran North American Online Sales and Operations, Asia Pacific & Latin America business and the Emerging Business channel. Ms. White is on the boards of directors of Olaplex Holdings Inc., Guayaki Sustainable Rainforest Products, Inc., and Gretel.ai. She was on the board of directors of Graco, Inc. from 2017 to 2022. Ms. White has also served on the boards of the National Center for Women in I.T., a non-profit coalition working to increase the participation of girls and women in computing and technology, and X-Prize, a non-profit focused on creating breakthroughs that pull the future forward. She received a BA in Art History from Vanderbilt University.

*Skills & Experience*

19

Our board of directors selected Ms. White to serve as a director because of her extensive experience with social networking and technology companies.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

63.    By reason of their positions as officers, directors, and/or fiduciaries of Lululemon and because of their ability to control the business and corporate affairs of Lululemon, the Individual Defendants owed Lululemon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lululemon in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lululemon and its shareholders so as to benefit all shareholders equally.

64.    Each director and officer of the Company owes to Lululemon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lululemon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.    To discharge their duties, the officers and directors of Lululemon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the

Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lululemon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Lululemon's Board at all relevant times.

68.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

69.    To discharge their duties, the officers and directors of Lululemon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Lululemon were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in

accordance with the laws and regulations of Delaware and the United States, and pursuant to Lululemon's own Global Code of Business Conduct and Ethics (the "Code of Conduct");

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Lululemon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Lululemon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lululemon's operations would comply with all applicable laws and Lululemon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Individual Defendants further owed to Lululemon and the shareholders the duty of loyalty requiring that each favor Lululemon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Lululemon and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, directorial, and controlling positions with Lululemon, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lululemon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate

assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

76.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Lululemon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lululemon, and was at all times acting within the course and scope of such agency.

## LULULEMON'S CODE OF CONDUCT

### *Code of Conduct*

79.     Lululemon's Code of Conduct "applies to all lululemon employees, ambassadors, contractors, officers, and directors." Additionally, the Code of Conduct states that the Company "support[s] a workplace environment that neither pressures nor encourages anyone to compromise our company's values or standards of conduct."

80.     Under the heading "We comply with all laws, and in doing so we contributed to healthy communities," the Code of Conduct states the following, in relevant part:

> We are all expected to comply with the law. This includes not only following the laws of our home market, but also complying with local laws when visiting different markets or transacting business with individuals, organizations, or guests located in a different market.

81.     In the same section, under the subheading "Insider Trading Laws," the Code of Conduct states:

> We may not buy or sell shares of lululemon stock (or securities of other companies) if we know of material information that has not been made public. Material information is any information that would influence a reasonable investor's decision to buy or sell stock.  Examples of "material information" include consolidated sales figures, the departure of an executive, or a significant issue with a key supplier. Trading in shares while in possession of non-public material information is a serious violation of securities law as is providing non-public material information to someone who may trade in our shares. Never provide material non-public information to other people, including family members or friends as it may enable them to improperly buy or sell securities using confidential information. Please refer to our Insider Trading Policy for more information. Members of our board of directors, executive officers, and certain other employees have additional restrictions on trading in lululemon securities, which are outlined in our Insider Trading Policy.

82.     Under the heading "Personal responsibility is the path to success," under the subheading "Protecting lululemon's Assets," the Code of Conduct states the following, in relevant part:

> We all have a responsibility to protect lululemon's assets from improper use or disclosure. This includes, among other things, protecting all non-public information from disclosure, including our trade secrets, design information, information about our suppliers, contracts, and manufacturing processes, guest information, financial

information and employee and pricing data, as well as not reproducing licensed or internally developed software for personal use. We also don't permit unauthorized photography or video recording of any nature in our stores, the SSC, the DCs or any other lululemon property.

83.     In the same section, under the subheading "Accurate Records," the Code of

Conduct states:

We must follow our system of internal controls and disclosure controls and ensure that corporate records and all securities filings are timely, legitimate, and accurate. Creating false or misleading records is prohibited, and all financial accounts, reports, and records are expected to be fair, accurate, and appropriately authorized.

84.     In the same section, under the subheading "Document Retention," the Code of

Conduct states:

We are expected to comply with all records management policies and legal hold notices. These policies apply to retention and destruction of all records created by lululemon, including, but not limited to, hard copies, electronic files, emails, instant messages, video, and backup tapes.

85.     Under the heading "Questions, concerns and assisting with investigations," under

the subheading "Waivers," the Code of Conduct states the following:

Waivers or exceptions to the Code for any employee will be granted only in advance and under exceptional circumstances by the Legal department. A waiver of the Code for any executive officer or member of our board of directors may be made only by the board of directors or a designated committee of the board.

### *Corporate Governance Guidelines*

86.     Lululemon also maintains a set of Corporate Governance Guidelines for the Board

to follow. The Corporate Governance Guidelines state that the "Role of Board and Management"

is as follows:

The Board of Directors (the "Board"), which is elected by the stockholders, is the ultimate decision-making body of lululemon athletica inc. (the "Company") except with respect to those matters reserved to the stockholders. The Board selects the senior management team, which is charged with the day-to-day conduct of the Company's business. Having selected the senior management team, the Board acts as an advisor and counselor to senior management and ultimately monitors its

performance.

The fundamental role of the members of the Board is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders. In fulfilling that responsibility, the directors may reasonably rely on the honesty and integrity of the Company's senior management and expert legal, accounting, financial and other advisors.

Directors are expected to attend Board and applicable committee meetings, absent extraordinary circumstances, and to review meeting materials in advance of such meetings. Directors are encouraged to attend the Company's annual meetings of stockholders.

87.     Under the heading "Risk Oversight," the Corporate Governance Guidelines state:

In its governance role, and particularly in exercising its duty of care and diligence, the Board is responsible for ensuring that appropriate risk management policies and procedures are in place to protect the Company's assets and business. While the Board has the ultimate oversight responsibility for the risk management process, the Board has delegated to the Audit Committee the initial responsibility of overseeing the Company's risk assessment and risk management. In fulfilling its delegated responsibility, the Audit Committee requires management to ensure that an approach to risk management is implemented as a part of the day- to-day operations of the Company, and to design internal control systems with a view to identifying and managing material risks. On a periodic basis (not less than quarterly), the Audit Committee reviews and discusses with the Company's Chief Executive Officer, its Risk and Advisory team and its Finance team the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks. In addition, the Audit Committee evaluates the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management, including discussing with management material risk exposures and the steps being taken to monitor, control and report such risks. The Audit Committee reports its activities to the full Board on a regular basis (not less than annually) and is responsible for making such recommendations with respect to risk assessment and management as it may deem necessary or appropriate. On a periodic basis (not less than annually), the PCC Committee reviews the various design elements of the Company's compensation policies and practices to determine whether any of their aspects encourage excessive or inappropriate risk- taking by the Company's executive officers. The PCC Committee reports its activities in this regard to the full Board and makes such recommendations to the Board with respect to the Company's compensation policies and practices as it may deem necessary or appropriate.

The Board oversees environmental, social and governance ("ESG") management at the Company and has delegated responsibility to both the Audit Committee and the CRSG Committee. The Board and its committees assess whether management

has appropriate mechanisms to oversee the development of ESG initiatives, strategies, policies, and practices related to matters of sustainability and corporate responsibility that may have a material impact on the Company. As part of this function, the Board and its committees review and discuss reports submitted by management with respect to the Company's current goals and metrics, as well as significant events, issues and risks that may affect the Company's business or financial performance.

88.     In violation of the Code of Conduct and Corporate Governance Guidelines, the

Individual Defendants conducted little, if any, oversight of the Company's engagement in the

Individual Defendants' scheme to issue materially false and misleading statements to the public

and to facilitate and disguise the Individual Defendants' violations of law, including breaches of

fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust

enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, two of

the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also, in

violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls,

failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of

Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical

manner, and properly report violations of the Code of Conduct.

## LULULEMON'S AUDIT COMMITTEE CHARTER

89.     The Company also maintains an Audit Committee Charter (the "Audit Committee

Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to:

The Audit Committee (the "Committee") is a standing committee of the Board of Directors of lululemon athletica inc. (the "Company"). The primary purpose of the Committee is to assist the Board of Directors in undertaking and fulfilling its oversight responsibilities in connection with:

- reviewing the financial reports and other financial information prepared by the Company for submission to any governmental or regulatory body or the public and monitoring the integrity of such financial reports;

- reviewing the Company's systems of internal controls established for finance, accounting, legal compliance and ethics;

- reviewing the Company's accounting and financial reporting processes generally and the audits of the financial statements of the Company;

- reviewing the Company's Global Risk & Advisory Services function;

- monitoring compliance with legal and regulatory requirements and overseeing the Company's corporate compliance program;

- monitoring the independence and performance of the Company's independent public accountants;

- overseeing the Company's financial risk assessment and risk management policies, procedures and practices;

- overseeing the Company's enterprise risk assessment and management policies, procedures and practices (including regarding those risks related to information security, cyber security and data protection); and

- providing effective communication among the Board of Directors, senior and financial management and the Company's independent public accountants.

90.     Under the heading "Relationship with Independent Public Accountants," the Audit

Committee Charter states:

The Company's independent public accountants shall be accountable to the Committee, and the Committee shall have sole authority to select, evaluate and replace the Company's independent public accountants. The Committee shall be directly responsible for the compensation and oversight of the work of the independent public accountant (including mediating disagreements between management and the independent public accountants regarding financial reporting) for the purpose of preparing or issuing an audit report, or performing other audit review or attest services or related work.  The independent public accountants shall report directly to the Committee. The Committee will ascertain that the independent public accountants will be available to the full Board of Directors at least annually (and more frequently if deemed appropriate by the Committee) to provide the Board of Directors with a timely analysis of significant financial reporting issues.  The Committee will not engage the independent public accountants to perform any of the services set forth in Section 10(A)(g) of the Exchange Act.

91.     Under the heading "Duties and Responsibilities," the Audit Committee Charter

states that:

> In furtherance of the Committee's responsibilities, the Committee's policies and
> procedures will remain flexible to best react to changing conditions and to ensure
> to the Board of Directors and stockholders that the corporate accounting and
> reporting practices of the Company are in accordance with applicable requirements
> and standards. Thus, the following functions are a guide with the understanding that
> the Committee may diverge from this guide as appropriate given the circumstances.

92.     In the same section, under the subheading titled "Review of Financial Reports and

Press Releases," the Audit Committee Charter states that the responsibilities of the Audit

Committee are as follows:

- The Committee shall review and discuss with management and the
  independent public accountants the audited financial statements and related
  footnotes to be included in the Company's Annual Report on Form 10-K
  (or the Annual Report to Stockholders if distributed prior to the filing of
  Form 10-K) prior to the filing of the Form 10-K, including the Company's
  disclosures under "Management's Discussion and Analysis of Financial
  Condition and Results of Operations" ("MD&A") and review and discuss
  with the independent public accountants the matters required to be
  discussed by the applicable requirements of the Public Company
  Accounting Oversight Board (PCAOB) and the SEC, and if applicable, the
  Canadian securities regulatory authorities.  The Committee shall
  recommend to the Board of Directors whether the audited financial
  statements should be included in the Company's Form 10-K.

- The Committee shall review with management and the independent public
  accountants interim financial results to be included in the Company's
  quarterly reports on Form 10-Q to be filed with the SEC and, if applicable,
  the Canadian securities regulatory authorities, MD&A and the matters
  required to be discussed by the applicable requirements of the PCAOB and
  the SEC prior to the Company's filing of any Form 10-Q.

- The Committee shall review disclosures made to the Committee by the
  Company's Chief Executive Officer and Chief Financial Officer, or the
  Company's disclosure committee or any member thereof, during their
  certification process for the Form 10-K or Form 10-Q and for the
  certifications, if applicable, required to be filed with the Canadian securities
  regulatory authorities, as appropriate.  In addition, the Committee shall
  discuss with the Company's management and independent public

accountants whether the Company's quarterly financial statements as well as significant events, transactions and changes in accounting estimates were considered by the independent public accountants (after performing their required quarterly review) to have affected the quality of the Company's financial reporting.  Such reviews will occur prior to the Company's filing of the Form 10-K, Form 10-Q and, to the extent practicable, prior to the quarterly earnings release. The Committee shall review the Company's earnings press releases, including the use of "pro-forma" or "adjusted" non-GAAP information (subject to compliance with law and applicable SEC rules, including Regulation G), as well as other publicly disclosed financial information and earnings guidance, prior to the issuance of any earnings press release, and discuss any of the foregoing with management to the extent desired by any member of the Committee.  Such discussion may be general in nature (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

93.    In the same section, under the subheading titled "Independent Public Accountants," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

- The Committee has responsibility for the retention and termination of the Company's independent public accountants and to set its fees.

- The Committee shall review with the independent public accountants the scope of the prospective audit, the estimated fees therefor and such other matters pertaining to such audit as the Committee may deem appropriate.

- The Committee shall review written disclosures received from the independent auditors regarding the auditors' independence, as required by the applicable requirements for the PCAOB, and shall discuss with the independent auditors their independence.

- The Committee shall pre-approve all auditing services and permitted non-audit services (including the fees for such services and terms thereof) to be performed for the Company or its subsidiary entities by its independent public accountant in one of two methods. For all auditing services, the engagement to render the services would be entered into pursuant to preapproval policies and procedures established by the Committee, provided (i) the policies and procedures are detailed as to the services to be performed, (ii) the Committee is informed of each service, and (iii) such policies and procedures do not include delegation of the Committee's responsibilities under the Exchange Act to the Company's management. For non-audit services, the engagement to render the services would be presented to and preapproved by the Committee (subject to the de minimis

exceptions for non-audit services described in Section 10A(i)(1)(B) of the Exchange Act that are approved by the Committee prior to the completion of the audit). The Committee's chairperson will have the authority to grant pre-approvals of audit and permissible non-audit services by the independent public accountants, and all pre-approvals by the chairperson must be presented to the full Committee at its next scheduled meeting.

- At least annually, the Committee shall receive and review a report by independent public accountants describing:

  o the Company's internal quality-control procedures, other matters relating to the accounting procedures and the books and records of the Company and the correction of controls deemed to be deficient;

  o any material issues raised by the most recent internal quality-control review, or peer review, of the Company, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and

  o all relationships between the independent public accountants and the Company. The report shall include a statement as to whether the relationships between the independent public accountant and the Company will impact on the independent public accountant's objectivity and independence.

- The Committee shall obtain the independent public accountant's assurance that the audit was conducted in a manner consistent with the Exchange Act, and other provisions of applicable law.

- The Committee shall take appropriate action to ensure the continuing objectivity and independence of the independent public accountants.

- The Committee shall review and discuss quarterly reports from the Company's independent public accountants regarding:

  o all critical accounting policies and practices to be used;

  o all alternative disclosures and treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent public accountant; and

32

o   all material written communications between the independent public accountants and management, such as any management letter or schedule of unadjusted differences.

- The Committee shall recommend to the Board of Directors policies for the Company's hiring of partners, employees, former partners or former employees of the independent public accountants who participated in any capacity in the audit of the Company.

94.    In the same section, under the subheading titled "Financial Reporting, Accounting Principles and Internal Control Matters," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

- The Committee shall advise management and the independent public accountants that they are expected to provide the Committee with a timely analysis of significant financial reporting, accounting, or internal control matters.

- The Committee shall review with the Company's management and the independent public accountants their judgments about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity and transparency of the disclosures in the financial statements.

- The Committee shall make or cause to be made, from time to time, such other examinations or reviews as the Committee may deem advisable with respect to the adequacy of the systems of internal controls and accounting practices of the Company and its subsidiaries and with respect to current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate.

- The Committee shall adopt and maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- The Committee may take all other appropriate action, including notifying the SEC, and, if applicable, the Canadian securities regulatory authorities, if the Company fails in any material respect to implement an appropriate response that the Committee has recommended for adoption by the Company.

95.    In the same section, under the subheading titled "Oversight of the Global Risk &

Advisory Services Function," the Audit Committee Charter states that the responsibilities of the

Audit Committee are as follows:

- The Committee shall review the qualifications of the Global Risk & Advisory Services function and concur on the appointment and replacement of the senior Global Risk & Advisory Services executive. Additionally, the Committee may review periodically the staffing plans, department responsibilities, and budget.

- The Committee shall review the Global Risk & Advisory Services function of the Company, including its independence and authority in the Company's reporting processes, the proposed audit plan for the coming year, and the coordination of such plans with the independent public accountants.

- The Committee shall review, as necessary, the adverse findings from Global Risk & Advisory Services reports along with management's responses. As appropriate, review and discuss with management these findings, repeat audit findings in prior audits or delays in corrective action plans.

- The Committee shall annually review any charter setting out the responsibilities of the Global Risk & Advisory Services function and approve any changes thereto as the Committee deems necessary or appropriate.

96.     In the same section, under the subheading titled "Risk Oversight," the Audit

Committee Charter states that the responsibilities of the Audit Committee are as follows:

- The Committee shall review the status of compliance with laws, regulations, and internal procedures, contingent liabilities and risks that may be material to the Company, the scope and status of systems designed to assure the Company's compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and other third parties as determined by the Committee on such matters, as well as major legislative and regulatory developments, including pronouncements by the Financial Accounting Standards Board, the SEC, the Canadian securities regulatory authorities and other agencies or bodies, on the Company's financial statements.

- The Committee shall meet periodically, but no less than quarterly, with management, the Company's Global Risk & Advisory Services team and the Company's independent public accountants to review and discuss the Company's significant financial risk exposures and the steps that management has taken to monitor, control and report such risks.

- The Committee shall regularly evaluate the Company's policies, procedures and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security and data protection).

- The Committee shall review and monitor the Company's cybersecurity and information security policies and procedures regarding cybersecurity and information security, and shall regularly report to the Board of Directors at such intervals as determined by the Committee the substance of those reviews and, as necessary, recommend to the Board of Directors such actions as the Committee determines necessary or advisable.

- The Committee shall report its risk oversight activities to the Board of Directors on a regular basis, but no less than annually, and in that regard shall make such recommendations to the Board of Directors with respect to risk assessment and risk management as the Committee may deem necessary or appropriate.

97.     In the same section, under the subheading titled "Ongoing Matters," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows, *inter alia*:

- The Committee shall prepare the report required by the rules of the SEC regarding the Committee, to be included in the Company's annual proxy statement and, if applicable, any reports required to be filed with the Canadian securities regulatory authorities.  In furtherance thereof, the Committee will include a statement within such report on whether the Committee has recommended that the financial statements be included in the Form 10-K and ensure that a copy of the Committee's Charter is publicly available to the extent required in accordance with applicable SEC rules.

- The Committee shall review with the Company's counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

- The Committee shall periodically review, and make any appropriate recommendations to the Board of Directors concerning updates or changes to, the Company's Global Code of Business Conduct and Ethics (the "Code"), and ensure that management has established a system to enforce the Code.  The Committee shall also review the procedures established by the Company that monitor the compliance by the Company with the Code by directors, officers and employees, and compliance by the Company with its loan and indenture covenants and restrictions. The Committee shall periodically review the effectiveness of the Company's corporate compliance program.

98.      In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

99.      Lululemon designs, distributes, and retails designer athletic wear. This includes apparel, footwear, and accessories. The Company's sales and revenue are divided into three territories: Americas, China Mainland, and Rest of World.

100.      Most of the Company's revenue comes from the Americas, which made up 79% of net revenue in the 2023 Fiscal Year, 94% of net revenue in the 2022 Fiscal Year, and 85% of net revenue in the 2021 Fiscal Year.

101.      In July 2024, the Company launched a new style of its leggings, called "Breezethrough." Breezethrough retailed at $98 each.

102.      The Breezethrough launch was marred by inventory issues and other problems. This prompted the leggings to be quickly pulled from stores and the online marketplace.

### False and Misleading Statements

### *December 7, 2023 Press Release*

103.    On December 7, 2023, the Company issued the 3Q 2023 Press Release. The 3Q 2023 Press Release represented that the Company's net revenue "increased 19% to $2.2 billion" while income from operations "decreased 4% to $338.1 million." The 3Q 2023 Press release also quoted Defendant McDonald, who stated, "This was another ***strong quarter for lululemon as our innovative product offerings*** and community activations continued to ***powerfully resonate with our guests globally***. . . ."

### *December 7, 2023 Form 10-Q*

104.    That same day, the Company filed the 3Q 2023 10-Q with the SEC. The 3Q 2023 10-Q was signed by Defendant Frank and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McDonald and Frank attesting to the accuracy of the 3Q 2023 10-Q and representing that "the information contained in the [3Q 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

105.    Regarding risks to the Company, the 3Q 2023 10-Q stated the following, in relevant part:

> If we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability

106.    Regarding the Company's inventory allocation, the 3Q 2023 10-Q stated the following, in relevant part:

> ***The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed***. Our inventory balance as of October 29, 2023 was $1.7 billion, a decrease of 4% from October 30, 2022.

37

*January 8, 2024 Press Release*

107.    On January 8, 2024, Lululemon issued a press release announcing an increase in its revenue and earnings expectations for the fourth quarter of the 2023 Fiscal Year (the "Revised 4Q 2023 Earnings Release"). The Revised 4Q 2023 Earnings Release announced that "for the fourth quarter of fiscal 2023, the Company now expect[ed] net revenue will be in the range of $3.170 billion to $3.190 billion, representing a 14% to 15% increase compared to the fourth quarter of fiscal 2022." This represented an increase in guidance of approximately .035 billion to .02 billion, up from the "previous guidance range of $3.135 billion to $3.170 billion."

108.    In addition to increasing the expected net revenue guidance, the Revised 4Q 2023 Earnings Release also announced an increase in diluted earnings per share to "the range of $4.96 to $5.00 for the fourth quarter of fiscal 2023 compared to the Company's previous guidance range of $4.85 to $4.93."

109.    Lastly, the Revised 4Q 2023 Earnings Release announced an increase in the Company's expected gross margin range. Compared to Lululemon's "previous guidance of 58.3% to 58.6%," the Revised 4Q 2023 Earnings Release announced that Lululemon "now expect[ed] gross margin to be in the range of 58.6% to 58.7% for the fourth quarter of fiscal 2023." Additionally, the Revised 4Q 2023 Earnings Release represented that there was "no change to the Company's previous guidance for selling, general, and administrative expenses or effective tax rate."

110.    In discussing the increased guidance, the Revised 4Q 2023 Earnings Release quoted Defendant Frank as stating:

> We are pleased with our performance during the holiday season, as guests continue to respond well to our innovative and versatile product offerings. ***Our sales trend remains balanced across channels, categories, and geographies, enabling us to***

*raise our guidance for the fourth quarter and close out another strong year*.

111.    The statements in paragraphs ¶¶103-110 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: ((1) the Company was experiencing issues with its inventory allocation and color palette execution; (2) as such, the launch of the Breezethrough leggings underperformed; (3) as a result of this, the Company's sales in the Americas began to stall; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Begins To Emerge As The False And Misleading Statements Continue

#### March 21, 2024 Press Release

112.    The truth began to emerge after the market closed on March 21, 2024 when the Company published the FY 2023 Press Release, announcing Lululemon's financial and operational results for the fourth quarter and full 2023 Fiscal Year. The FY 2023 Press Release announced disappointing results, with reported net revenue growth in the Americas of 9% for the quarter and 12% for the full year, short of the 12% growth reported in the third quarter and the 29% growth reported in the 2022 Fiscal Year. In sum, the FY 2023 Press Release stated the following, in relevant part:

**For the fourth quarter of 2023, compared to the fourth quarter of 2022**:

- Net revenue increased 16% to $3.2 billion.

    o Americas net revenue increased 9%.

* * *

    o Americas comparable sales increased 7%.

* * *

**For 2023 compared to 2022**:

- Net revenue increased 19% to $9.6 billion, or increased 20% on a constant dollar basis.

  o Americas net revenue increased 12%.
  * * *
  o Americas comparable sales increased 8%, or 9% on a constant dollar basis.
  * * *

During the fourth quarter, ***we saw continued momentum across our channels, geographies, and merchandise categories***, driven by our teams around the world. As we step into 2024, we are focused on the ***significant opportunities ahead for lululemon as we navigate the dynamic retail environment and deliver for guests through innovative new products and brand activations***."

***March 21, 2024 Earnings Call***

113.    Also on March 21, 2024, the Company hosted an earnings conference call with investors and analysts to discuss its financial and operational results for the fourth quarter and full 2023 Fiscal Year (the "FY 2023 Earning Call"). During the call, Defendant McDonald revealed some inventory issues plaguing the Company and explained how this led to the negative results, stating:

As I mentioned, ***our sizing in particular in zero to four is something we're chasing into. Color, where we had color, it performed well. And honestly, we just did not have enough***. And both of these attributes over-index in the U.S., which is where I see the opportunity. And we're going to continue to play offense in the market. The innovation product pipeline remains very strong for this year and we have some exciting brand initiatives in addition.

Where that's showing up? ***We're seeing a slowdown in traffic in the U.S.***, but it's still positive and conversion is down slightly. And I ***link that to some of the product opportunities we have in the sizing and color, which as I said, we will -- we are chasing*** until we will get stronger through the quarters.

114.    On this news, the price of the Company's common stock fell $75.65 per share, or approximately 15.8%, from a closing price of $478.84 per share on March 21, 2024 to a closing

price of $403.19 per share on March 22, 2024. However, the Individual Defendants continued to obfuscate the truth about the Company's inefficient inventory allocation procedures.

### *March 21, 2024 10-K*

115.    That same day, the Company filed with the SEC its annual report on Form 10-K for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants McDonald, Frank, Morfitt, Casey, Grant, Henry, List, Loehnis, Mahe, McNeill, Mussafer, and White and included SOX certifications signed by Defendants McDonald and Frank attesting to the accuracy of the 2023 10-K and representing that "the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

116.    While reaffirming the results reported in the FY 2023 Press Release, the 2023 10-K also warned of the Company's potential risks, stating:

> *If* we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.
>
> * * *
>
> Our results of operations *could* be materially harmed *if* we are unable to accurately forecast guest demand for our products.

117.    Despite this and the issues discussed in the FY 2023 Earnings Call, the 2023 10-K represented that the Company still had effective inventory allocation, stating:

> *The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed*. Our inventory balance as of January 28, 2024 was $1.3 billion, a decrease of 9% from January 29, 2023. We expect our inventories to decrease during the first half of 2024 compared to the first half of 2023, and then increase in the second half of 2024 compared to the second half of 2023.

### *April 25, 2024 Proxy Statement*

118.    On April 25, 2024, the Company filed the 2024 Proxy Statement with the SEC.

Defendants McDonald, Casey, Grant, Henry, List, Loehnis, Mahe, Morfitt, Mussafer, and White solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

119.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants McDonald, Mahe, Morfitt, White, Grant, and List to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

120.    Regarding "Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> In its governance role, and particularly in exercising its duty of care and diligence, our board of directors is responsible for overseeing and assessing risk management policies and procedures designed to protect the company's assets and business. While our board of directors has the ultimate oversight responsibility for the risk management process, our board of directors has delegated to the audit committee the initial responsibility of overseeing the company's risk assessment and risk management. In fulfilling its delegated responsibility, the audit committee has directed management to ensure that an approach to risk management is implemented as a part of the day-to-day operations of lululemon, and to design internal control systems with a view to identifying and managing material risks.

> On a periodic basis, the audit committee reviews and discusses with the appropriate members of our finance team and our internal auditors the company's significant financial risk exposures and the steps that management has taken to monitor, control, and report those risks. In addition, the audit committee regularly evaluates the company's policies, procedures, and practices with respect to enterprise risk assessment and risk management (including those risks related to information security, cyber security, and data protection), including discussions with management about material risk exposures and the steps being taken to monitor, control, and report those risks. The audit committee reports its activities to the full board of directors on a regular basis and in that regard makes such recommendations to our board of directors with respect to risk assessment and management as it may deem necessary or appropriate.

> Further to its risk oversight role delegated from the board, the audit committee maintains a cybersecurity sub-committee that is comprised of our Chief

Information Officer ("CIO"), our Chief Information Security Officer ("CISO"), and representatives from the audit committee and board of directors that have knowledge and experience in cybersecurity matters. The cybersecurity sub-committee reviews our cybersecurity risk assessments and the steps being taken to monitor, control, and report on those risks as well as discusses regulatory and market developments. They also review our process for identifying and responding to cybersecurity incidents in a timely manner, and details of cybersecurity attacks or incidents which have occurred. Management generally meets with, and provides reports to, the cybersecurity sub-committee on a quarterly basis. Our CIO and CISO also meet with and provide reports to the audit committee at least quarterly. The board of directors receives periodic reports regarding the activities of the cybersecurity sub-committee. These reports and meetings are designed to inform the board of directors and committees about the current state of our information security program including cybersecurity risks, the nature, timing, and extent of cybersecurity incidents, if any, and the resolution of such matters.

On a periodic basis, the people, culture and compensation committee reviews the various design elements of our compensation policies and practices to determine whether any of their aspects encourage excessive or inappropriate risk-taking by our executive officers. The people, culture and compensation committee reports its activities in this regard to the full board of directors and makes such recommendations to our board of directors with respect to our compensation policies and practices as it may deem necessary or appropriate.

The board oversees environmental, social and governance management of the company and has delegated responsibility to both the audit committee and the corporate responsibility, sustainability and governance committee. The board and its committees assess whether management has appropriate mechanisms to oversee the development of ESG initiatives, strategies, policies and practices related to matters of sustainability and corporate responsibility that may have material impact on the company. As part of this function, the board and its committees review and discuss reports submitted by management with respect to the company's current goals and metrics, as well as significant events, issues and risks that may affect the company's business or financial performance.

121.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following,

in relevant part:

We have adopted a code of business conduct and ethics that applies to all of the officers, directors and employees of lululemon and our subsidiaries. The most current version is available on our website at www.lululemon.com. If we make any substantive amendments to the code or grant any waiver from a provision of the code to any executive officer or director, we will disclose the nature of the amendment or waiver on our website, as well as via any other means required by Nasdaq rules or applicable law.

122.    Defendants McDonald, Casey, Grant, Henry, List, Loehnis, Mahe, Morfitt, Mussafer, and White caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was experiencing issues with its inventory allocation and color palette execution; (2) as such, the launch of the Breezethrough leggings underperformed; (3) as a result of this, the Company's sales in the Americas began to stall; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

123.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

124.    As a result of Defendants McDonald, Casey, Grant, Henry, List, Loehnis, Mahe, Morfitt, Mussafer, and White causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants McDonald, Mahe, Morfitt, White, Grant, and List to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

### *April 25, 2024 Annual Report*

125.    Also on April 25, 2024, Lululemon published its 2023 Annual Report, which stated

the following, in relevant part:

> We believe one of our competitive advantages is our ability to consistently bring newness and innovation into our assortment, and that our proprietary fabrics, innovative designs, and functional technology set us apart.

* * *

> Our design and development team continues to source technically advanced fabrics, with new feel and fit, and craft innovative functional features for our products. ***Through our vertical retail strategy and direct connection with our customers, whom we refer to as guests, we are able to collect feedback and incorporate unique performance and fashion needs into our design process***. In this way, we believe we are better positioned to address the needs of our guests, helping us advance our product lines and differentiate us from our competitors.

* * *

> ***Our operations in the Americas are core to our business and we aim to continue to grow our net revenue in this market through ongoing product innovation*** and by building brand awareness.

***May 21, 2024 Press Release***

126.    On May 21, 2024, Lululemon published a press release which disclosed that the Company was "implementing an updated and more integrated organizational structure," which was "intended to support the company's near- and long-term growth plans, ***accelerate product innovation, and further enable its go-to-market strategies.***" Defendant McDonald was quoted in the press release as stating that "***the new structure will enable us to solve for the unmet needs of our guests in a more efficient, unique, and powerful way.***"

***June 5, 2024 Press Release***

127.    On June 5, 2024, Lululemon issued a press release announcing its financial results for the first quarter of the 2024 Fiscal Year (the "1Q 2024 Press Release"). The 1Q 2024 Press Release announced an increase in the Company's revenue of 10%, to $2.2 billion, as well as an increase in income from operations of 8%, to $432.6 million.

45

128.    The 1Q 2024 Press Release also stated the following, in relevant part:

> ***Guests responded well to our product innovations across categories, and we are pleased by the progress we are making to optimize our U.S. product assortment***. Looking ahead, we continue to have a significant runway for growth and are confident in our team's ability to powerfully deliver for our guests in 2024 and beyond.

***June 5, 2024 10-Q***

129.    That same day, the Company filed with the SEC its Form 10-Q for first quarter of the 2024 Fiscal Year (the "1Q 2024 10-Q"). The 1Q 2024 10-Q was signed by Defendant Frank and included SOX certifications signed by Defendants McDonald and Frank attesting to its accuracy and representing that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

130.    In discussing potential risks facing the Company, the 1Q 2024 10-Q used the same "if" language that was used in the 2023 10-K, stating:

> ***If*** we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability.

131.    Additionally, the 1Q 2024 10-Q continued to state the Company's inventory allocation procedures remained effective, stating:

> ***The timing and cost of our inventory purchases will vary depending on a variety of factors such as revenue growth, assortment and purchasing decisions, product costs including freight and duty, and the availability of production capacity and speed***. Our inventory balance as of April 28, 2024 was $1.3 billion, a decrease of 15% from April 30, 2023.

132.    The statements in ¶¶112-113, 115-117, and 125-131 were materially false and misleading because they failed to disclose, *inter alia*, that:  (1) the Company was experiencing issues with its inventory allocation and color palette execution; (2) as such, the launch of the Breezethrough leggings underperformed; (3) as a result of this, the Company's sales in the

Americas began to stall; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times

## THE TRUTH FULLY EMERGES

### *July 24, 2024 Bloomberg Report*

133.    The truth fully emerged on July 24, 2024, when Bloomberg analysts published the July 2024 Bloomberg Report. The July 2024 Bloomberg Report revealed that the Company's recent launch of Breezethrough leggings was "raising concern[]." Specifically, the July 2024 Bloomberg Report revealed that the launch was marred by "inconsistent" inventory allocation and pricing, with "certain locations carr[ying] Breezethrough leggings while others didn't carry the new line." The July 2024 Bloomberg Report also suggested that this was related to "ongoing allocation-related issues."

134.    On this news, the price of the Company's common stock fell $9.31 per share, or approximately 3.3%, from a closing price of $281.37 per share on July 23, 2024 to a closing price of $272.06 per share on July 24, 2024.

135.    The following day, on July 25, 2024, before the market opened, Bloomberg reported that a Company spokesperson had informed the agency that Lululemon "made the decision to pause on sales [of the Breezethrough yoga wear] for now to make any adjustments necessary to deliver the best possible product experience."

136.    On this news, the price of the Company's common stock fell an additional $24.74 per share, or approximately 9.1%, from a closing price of $272.06 per share on July 24, 2024 to a closing price of $247.32 per share on July 25, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

137.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $914.3 million*** to repurchase approximately 2,702,519 shares of its own common stock at artificially inflated prices between November 27, 2023 and July 28, 2024.

138.     According the 2023 10-K, between November 27, 2023 and December 31, 2023, the Company repurchased 10,040 shares of its own common stock at an average price per share of approximately $507.57, for a total cost to the Company of approximately $5,096,002.80.

139.     As the Company's stock was actually worth only $247.32 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $2,612,910 for repurchases of its own stock between November 27, 2023 and December 31, 2023.

140.     According to the 2023 10-K, between January 1, 2024 and January 28, 2024, the Company repurchased 59,180 shares of its own common stock at an average price per share of approximately $483.73, for a total cost to the Company of approximately $28,627,141.40.

141.     As the Company's stock was actually worth only $247.32 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $13,990,743.80 for repurchases of its own stock between January 1, 2024 and January 28, 2024.

142.     According to the 1Q 2024 10-Q, between January 29, 2024 and February 25, 2024, the Company repurchased 116,858 shares of its own common stock at an average price per share of approximately $459.59, for a total cost to the Company of approximately $53,706,768.22.

143.     As the Company's stock was actually worth only $247.32 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $24,805,447.66 for repurchases of its own stock between January 29, 2024 and February 25, 2024.

144.     According to the 1Q 2024 10-Q, between February 26, 2024 and March 31, 2024, the Company repurchased 186,147 shares of its own common stock at an average price per share of approximately $441.25, for a total cost to the Company of approximately $82,137,363.75.

145.     As the Company's stock was actually worth only $247.32 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $36,099,487.71 for repurchases of its own stock between February 26, 2024 and March 31, 2024.

146.     According to the 1Q 2024 10-Q, between April 1, 2024 and April 28, 2024, the Company repurchased 448,222 shares of its own common stock at an average price per share of approximately $359.42, for a total cost to the Company of approximately $161,099,951.24.

147.     As the Company's stock was actually worth only $247.32 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $50,245,686.20 for repurchases of its own stock between April 1, 2024 and April 28, 2024.

148.     According to the quarterly report on the Company filed with the SEC on Form 10-Q on August 29, 2024 (the "2Q 2024 10-Q"), between April 29, 2024 and May 26, 2024, the Company repurchased 478,784 shares of its own common stock at an average price per share of approximately $346.34, for a total cost to the Company of approximately $165,822,050.56.

149.     As the Company's stock was actually worth only $247.32 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $47,409,191.68 for repurchases of its own stock between April 29, 2024 and May 26, 2024.

150.     According to the 2Q 2024 10-Q, between May 27, 2024 and June 30, 2024, the Company repurchased 658,706 shares of its own common stock at an average price per share of approximately $309.04, for a total cost to the Company of approximately $203,566,502.24.

151.     As the Company's stock was actually worth only $247.32 per share, the price at

closing on July 25, 2024, the Company overpaid by approximately $40,655,334.32 for repurchases of its own stock between May 27, 2024 and June 30, 2024.

152.    According to the 2Q 2024 10-Q, between July 1, 2024 and July 28, 2024, the Company repurchased 744,582 shares of its own common stock at an average price per share of approximately $287.77, for a total cost to the Company of approximately $214,268,362.14.

153.    As the Company's stock was actually worth only $247.32 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $30,118,341.90 for repurchases of its own stock between July 1, 2024 and July 28, 2024.

154.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by *$245,937,143.27*.

## DAMAGES TO LULULEMON

155.    As a direct and proximate result of the Individual Defendants' conduct, Lululemon will lose and expend many millions of dollars.

156.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

157.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

158.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

159.    Such expenditures include the $245,937,143.27 that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

160.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

161.    As a direct and proximate result of the Individual Defendants' conduct, Lululemon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

162.    Plaintiff brings this action derivatively and for the benefit of Lululemon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Lululemon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

163.    Lululemon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

164.    Plaintiff is, and has been at all relevant times, a shareholder of Lululemon. Plaintiff will adequately and fairly represent the interests of Lululemon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to

enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Lululemon's Board consisted of the following eleven individuals: Defendants McDonald, Casey, Grant, Henry, List, Loehnis, Mahe, McNeill, Morfitt, Mussafer, and White (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the eleven Director-Defendants that were on the Board at the time this action was filed.

167.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by **over $245.9 million** for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

168.    The Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Grant, List, Mahe, McDonald, Morfitt, and

White to the Board, thus allowing them to continue breaching their fiduciary duties to Lululemon.

169.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Lululemon to issue materially false and misleading statements. Specifically, the Director-Defendants caused Lululemon to issue false and misleading statements which were intended to obscure the ineffectiveness of Lululemon's product allocation procedures and stalling growth in the Americas. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

170.    Additional reasons that demand on Defendant McDonald is futile to follow. Defendant McDonald has served as the CEO and as a Company director since August 2018. The Company provides Defendant McDonald with his principal occupation, for which he receives handsome compensation. Furthermore, he signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Grant, List, Mahe, Morfitt, and White, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. As the trusted CEO, Defendant McDonald conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. He is also a defendant in the Securities Class Action. Furthermore, he engaged in lucrative insider trading while in possession of material

nonpublic information, obtaining personal proceeds of approximately $12.4 million.  For these reasons, too, Defendant McDonald breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Casey is futile to follow. Defendant Casey has served as a Company director since October 2007. Previously, he served as the Chair of the Board from May 2014 until September 2014, and then as Co-Chair of the Board from September 2014 until April 2017. He currently serves as the Chair of the Audit Committee and as a member of the People, Culture & Compensation Committee. Defendant Casey received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Casey signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Grant, List, Mahe, McDonald, Morfitt, and White to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Casey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Grant is futile follow. Defendant Grant has served as a Company director since November 2023. He also serves as a member of the Audit Committee. Defendant Grant has received and continues to receive handsome compensation for his role as Company director. In addition, Defendant Grant signed the false and misleading

2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants List, Mahe, McDonald, Morfitt, and White, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Grant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Henry is futile follow. Defendant Henry has served as a Company director since January 2016. She also serves as a member of the Audit Committee and the People, Culture & Compensation Committee. Defendant Henry has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Henry signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Grant, List, Mahe, McDonald, Morfitt, and White to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Henry breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant List is futile follow. Defendant List has served as a Company director since March 2024. She also serves as a member of the Audit Committee. Defendant List has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant List solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Grant, Mahe, McDonald, Morfitt, and White, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant List breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Loehnis is futile to follow. Defendant Loehnis has served as a Company director since January 2022. She also serves as a member of the Audit Committee. In addition, Defendant Loehnis signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Grant, List, Mahe, McDonald, Morfitt, and White to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Loehnis breached her fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Mahe is futile follow. Defendant Mahe has served as a Company director since November 2022. She also serves as a member of the Corporate Responsibility, Sustainability & Governance Committee and the People, Culture & Compensation Committee. Defendant Mahe has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Mahe signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Grant, List, McDonald, Morfitt, and White, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Mahe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant McNeill is futile follow. Defendant McNeill has served as a Company director since April 2016. He also serves as a member of the Corporate Responsibility, Sustainability & Governance Committee. Defendant McNeill has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant McNeill signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Grant, List, Mahe, McDonald, Morfitt, and White to the Board, thereby allowing them to continue breaching their

fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant McNeill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Morfitt is futile follow. Defendant Morfitt has served as a Company director since December 2008 and as the Chair of the Board since March 2022. She also serves as a member of the Audit Committee. Defendant Morfitt has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Morfitt signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Grant, List, Mahe, McDonald, and White, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Morfitt breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Mussafer is futile follow. Defendant Mussafer has served as a Company director since September 2014. Previously, he also served as a

director from 2005 until 2010. He also serves as the Lead Director and as the Chair for the Corporate Responsibility, Sustainability & Governance Committee. Defendant Mussafer has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Mussafer signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Grant, List, Mahe, McDonald, Morfitt, and White to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mussafer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant White is futile follow. Defendant White has served as a Company director since November 2011. She also serves as the Chair of the People, Culture & Compensation Committee and as a member of Corporate Responsibility, Sustainability & Governance Committee. Defendant White has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant White signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Grant, List, Mahe, McDonald, and Morfitt, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her

duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant White breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

181.    Additional reasons that demand on the Board is futile follow.

182.    Defendant Casey, Grant, Henry, List, Loehnis, and Morfitt (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

183.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts

of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

184.    Lululemon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Lululemon any part of the damages Lululemon suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

185.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

186.    The acts complained of herein constitute violations of fiduciary duties owed by Lululemon's officers and directors, and these acts are incapable of ratification.

187.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Lululemon. If there is a directors' and officers'

liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Lululemon, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

188.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Lululemon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

189.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### **FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

192.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

193.    Under the direction and watch of Defendants McDonald, Casey, Grant, Henry, List, Loehnis, Mahe, Morfitt, Mussafer, and White, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

194.    The 2024 Proxy Statement also failed to disclose that: (1) the Company was experiencing issues with its inventory allocation and color palette execution; (2) as such, the launch of the Breezethrough leggings underperformed; (3) as a result of this, the Company's sales in the Americas began to stall; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

195.    In exercise of reasonable care, Defendants McDonald, Casey, Grant, Henry, List,

Loehnis, Mahe, Morfitt, Mussafer, and White should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election of Defendants Grant, List, Mahe, McDonald, Morfitt, and White.

196.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Grant, List, Mahe, McDonald, Morfitt, and White to the Board, which allowed them to continue to breach their fiduciary duties to the Company.

197.    The Company was damaged as a result of Defendants McDonald's, Casey's, Grant's, Henry's, List's, Loehnis's, Mahe's, Morfitt's, Mussafer's, and White's material misrepresentations and omissions in the 2024 Proxy Statement.

198.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

199.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.    The Individual Defendants, by virtue of their positions with Lululemon and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Lululemon and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Lululemon to engage in the illegal conduct and practices complained of herein.

201.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## THIRD CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Lululemon. Not only is Lululemon now defending claims that is violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Lululemon by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *2,702,519* of its own shares at artificially inflated prices, damaging Lululemon.

204.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

205.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lululemon not misleading.

206.    The Individual Defendants as top executives and directors acted with scienter

during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

207.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lululemon's business and affairs.

210.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

211.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Lululemon.

212.    In breach of their fiduciary duties owed to Lululemon, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was

experiencing issues with its inventory allocation and color palette execution; (2) as such, the launch of the Breezethrough leggings underperformed; (3) as a result of this, the Company's sales in the Americas began to stall; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

213.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

214.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

215.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $13.2 million.

216.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were

committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

217.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lululemon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

220.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

221.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lululemon.

222.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Lululemon that was tied to the performance or artificially inflated valuation of Lululemon, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

223.    Plaintiff, as a shareholder and representative of Lululemon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained

by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

224.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

225.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

226.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lululemon, for which they are legally responsible.

227.    As a direct and proximate result of the Individual Defendants' abuse of control, Lululemon has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

228.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

229.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

230.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lululemon in a manner consistent with the operations of a publicly held corporation.

231.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lululemon has sustained and will continue to sustain significant damages.

232.    As a result of the misconduct and breaches of duty alleged herein, the Individual

Defendants are liable to the Company.

233.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

234.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

235.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

236.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

237.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

238.    Plaintiff, on behalf of Lululemon, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants McDonald and Frank for Contribution Under Sections 10(b) and 21D of the Exchange Act

239.    Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

240.    Lululemon and Defendants McDonald and Frank are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants

McDonald's and Frank's willful and/or reckless violations of their obligations as officers, directors, and/or former officers Lululemon.

241.    Defendants McDonald and Frank, because of their positions of control and authority as officers and/or directors of Lululemon, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Lululemon, including the wrongful acts complained of herein and in the Securities Class Action.

242.    Accordingly, Defendants McDonald and Frank are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

243.    As such, Lululemon is entitled to receive all appropriate contribution or indemnification from Defendants McDonald and Frank.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Lululemon, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lululemon;

(c)    Determining and awarding to Lululemon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Lululemon and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lululemon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2. a provision to permit the shareholders of Lululemon to nominate at least six candidates for election to the Board;

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Lululemon restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: November 4, 2024

           Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

<u>*/s/ Timothy Brown*</u>
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
John Coyle
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net
        edonohoe@thebrownlawfirm.net
        jcoyle@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Denish Bhavsar, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of November, 2024.

11/2/2024

DocuSigned by:

*Denish Bhavsar*

925339D774464FC...

Denish Bhavsar